NAT HARRISON ASSOCIATES, INC., Plaintiff-Appellant, Plaintiff-Appellee,

v.

LOUISVILLE GAS AND ELECTRIC CO., and Ohio Valley Transmission Corp., Defendants-Appellees, Defendants-Appellants.

Nos. 73–1468, 73–1469.

United States Court of Appeals, Sixth Circuit.

Jan. 13, 1975.

Certiorari Denied May 27, 1975.

See 95 S.Ct. 1992.

**512**

Thomas C. Carroll, Louisville, Ky., James E. Glass, Miami, Fla., John Robert Terry, Miami, Fla., for plaintiff-appellant, plaintiff-appellee.

Gerald Kirven, Joseph R. Gathright, Jr., Jefferson D. Stewart, III, Louisville, Ky., for defendants-appellees, defendants-appellants.

Before EDWARDS, CELEBREZZE and ENGEL, Circuit Judges.

ENGEL, Circuit Judge.

These appeals are the result of a contractual dispute between plaintiff Nat Harrison, Inc. (hereinafter Harrison) and defendants Louisville Gas and Electric Company and Ohio Valley Transmission Corporation,[1] (hereinafter jointly referred to as Louisville).

In early 1968, Louisville solicited private bids for performing all work and furnishing certain materials needed to install conductors, shield wire, and line hardware on a new 345,000 volt double circuit steel tower transmission line. The line was to run from Cane Run Generating Station in Louisville, Kentucky to Middletown Substation near Middletown, Kentucky, a distance of approximately forty-two miles (hereinafter referred to as the Cane Run project). Harrison was the successful bidder. Upon completion of the transmission line, Harrison instituted a diversity action against Louisville. The complaint contained two counts. Count I sought reformation of the contract price, alleging that Harrison made a mistake in computing and submitting its bid. It further alleged that Louisville knew or should have known that a material mistake had been made because of its experience in this field, the estimate of its own engineers, and the amount of other competitive bids. Count II sought money damages for breach of contract arising from an alleged failure by Louisville to supervise and direct the work.

This lawsuit was tried twice, both times before a jury. In the first trial, the district court granted a defense motion to dismiss count II, but submitted count I to the jury.[2] The jury, however, was unable to reach a verdict and was discharged. Louisville's motion for judgment notwithstanding the jury's failure

---

1. Ohio Valley Transmission Corporation is a subsidiary of Louisville Gas and Electric Company.

2. Louisville made a general demand for a jury trial and Harrison requested a jury "on all issues so triable as a matter of right". An action for reformation of contract, however, is equitable in nature and hence triable to the court. 5 Moore's Federal Practice § 38.22 (2nd ed. 1971). Neither Louisville nor Harrison objected to count I being submitted to the jury. Under these circumstances, therefore, it was not error for the trial court to submit the issue to the jury. F.R.Civ.P. 39.

to agree was denied by the district court. Count I was retried and following the second trial,[3] the jury reformed the contract and awarded damages in the amount of $293,230.00.

### APPEAL NUMBER 73–1469

■ In appeal number 73–1469, appellant Louisville contends that it was entitled to judgment in its favor on count I notwithstanding the jury's failure to agree at the first trial. In reviewing the denial of Louisville's Rule 50(b) motion, we view the evidence, and reasonable inferences to be drawn therefrom, in the light most favorable to Harrison. Fortner Enterprises, Inc. v. United States Steel Corp., 452 F.2d 1095 (6th Cir. 1971), cert. denied 406 U.S. 919, 92 S.Ct. 1773, 32 L.Ed.2d 119. This being a diversity of citizenship case, the substantive law of Kentucky applies.

■ Harrison sought reformation of the contract on the theory that it made a unilateral mistake in submitting its bid, accompanied by fraud or inequitable conduct on the part of Louisville in accepting the bid, when it knew or should have known that a material mistake had been made in the bid. Kentucky recognizes this theory as a basis for reformation of a contract. City of Campbellsville v. Taylor County Telephone Co., 229 Ky. 843, 18 S.W.2d 305 (1929) and Beatty v. Donahue, 249 S.W.2d 33 (Ky.1952). The parties concede that under Kentucky law a party sustains the burden of proving a right of reformation on the ground of mistake if evidence favorable to it is sufficient in quantity and quality to be clear and convincing. Deskins v. Leslie, 387 S.W.2d 596 (Ky.1965). Each case must be viewed against its own peculiar facts and circumstances. The rule in essence means nothing more than that the entire proof, together with the surrounding circumstances, shall be sufficient to convince a reasonable mind of the truth of the grounds alleged, and to dispel any well founded doubts on the subject. Glass v. Bryant, 302 Ky. 236, 194 S.W.2d 390, 393 (1946). While this case is unusual in its submission of normally equitable issues to a jury, we conclude that the threshold issue of sufficiency of the evidence, measured by the clear and convincing rule, was for the trial judge to determine.

The facts involved in this case are quite involved, but it is necessary to repeat them here in some detail, since it is from the facts presented, construed in the light most favorable to appellee, that we must determine whether Harrison was entitled to have its case put to the jury. The Cane Run project was part of a larger expansion program which had been in the planning stage at Louisville for some five years prior to 1968. Although Louisville had its own special construction department capable of doing all the work on this project, the press of work persuaded it to solicit bids for the wire stringing aspect of the project. Louisville did, however, plan to construct the foundations and erect the steel towers which would support the transmission line.

In 1967 Robert Somers, an employee of Louisville's special construction department, estimated that the wire stringing costs of the Cane Run project, if done by an independent contractor, would total $721,075, including indirects and a 10% profit.

Louisville sent proposals for wire stringing to nine contractors and invited them to a pre-bid conference at its offices in late February or early March of 1968. Harrison was represented at this conference by its vice president, Mr. Allan C. Baker, a man of considerable experience in the construction of high voltage transmission lines. Louisville disseminated to each contractor the various contract documents and job specifica-

---

3. Prior to the second trial, Louisville moved to strike Harrison's demand for a jury trial. This motion was denied by the district court and Louisville assigns this as one of the errors committed at the second trial. Because we find that the district court should have granted Louisville's motion for judgment notwithstanding the jury's failure to agree at the first trial, we do not need to decide whether it was error to submit count I to the jury in the second trial.

tions relating to the work, and took the representatives, including Baker, on a tour of part of the line. The bidders were also directed to submit with their proposed bids a description of the methods and equipment to be used for the wire stringing. Finally, Louisville expressly reserved the right to open the bids privately and unannounced and to reject any or all bids.

Harrison, an electrical and general contractor, had previously installed high voltage lines such as the one called for on the Cane Run project. Mr. Baker prepared Harrison's bid.

According to Baker, the wire stringing job for which bids were solicited by Louisville, consisted of six basic operations: hanging insulators and travelers on the towers, installing guard structures, pulling lead lines, pulling conductors, making up dead-ends and jumpers, and clean-up. In preparing Harrison's bid, Baker assigned a work crew and equipment to each operation. On an "estimating form" Baker estimated separately for each of the six operations involved, the labor costs of each crew assigned to that operation. On an "equipment sheet", Baker estimated the equipment costs that would be incurred at each operation. He then attached the estimating form of each project to the corresponding equipment sheet. In arriving at Harrison's bid, Baker apparently computed the total of these estimates, from that data that he had compiled.

The contract documents distributed by Louisville directed the bidders to submit a lump sum bid as well as a breakdown into work performed in Kentucky, work performed in Indiana, and work performed at river crossings. Harrison's final lump sum bid was $687,500 and was broken down into $486,000 for work in

Kentucky, $154,000 for work in Indiana, and $47,000 for work at the river crossings. The contract documents also required the bidder to supply unit prices on which the bidder would agree to make changes in the work.[4] These unit prices covered the installation of conductors over the two river crossings, the installation of conductors over the remainder of the line, and the installation of shield or ground wire over the entire line.[5] The bidders were also asked to provide a price per mile figure for the installation of these three types of conductors. Harrison's bid allocated $20,000 per mile for the installation of conductors at the river crossings, $15,000 per mile for the installation of conductors over the remainder of the line, and $1,500 per mile for the installation of shield wire over the entire line.[6]

Bids were to be submitted to Louisville no later than 5:00 p. m. March 29, 1968, and were to be directed to the attention of Louisville's superintendent of special construction, Mr. M. S. Winstandley. Harrison's original bid of $747,000 was mailed to Louisville on March 26, 1968. A letter from Baker to Winstandley accompanied Harrison's bid, and read in part:

"Our firm is most desirous of doing this work for you and we feel our qualifications would prove a substantial savings in time and other expenditures to your company.

"This project would prove most timely for our mutual interest, since we will complete a major wire stringing project at least three weeks prior to this time, and, therefore, would be in a position to offer a complete spread of equipment and management intact for your project. It is conceivable that

4. Apparently, these unit prices would be applicable if the transmission line was shortened or extended.

5. Conductor is the actual wire or cable that emits the electricity through it. Evidently, a different type of conductor was used over the river crossings than was used over the remainder of the transmission line.

6. Although these figures are applicable to changes in work, they give a reasonably accurate portrayal of Harrison's lump sum bid. Thus, when the figures are multiplied by the number of miles of transmission line, the total is $733,000 (i. e., $20,000 × 2 river crossings = $40,000; + 15,000 × 42 miles = $630,-000; + $1,500 × 42 miles = $63,000). This figure is close to Harrison's original bid of $747,000.

crews could be moved from the project now underway to your operation without any lost time.

"This, of course, would keep our efficiency at a maximum and provide the reflected cost savings as we have indicated."

Louisville received Harrison's bid and the bid of Power Constructors, Inc. on March 28, 1968. On March 29, 1968 Baker telephoned Winstandley to be sure that the Harrison bid had been received. Baker also wanted to find out, if he could, where Harrison stood in the bidding. Baker testified that Winstandley told him that all bids looked good and "you're in the park, but I can't tell you you're low bidder."

Baker testified that his conversation with Winstandley gave him the impression that Harrison was not the low bidder and, therefore, he discussed the possibility of reducing the bid with the president of the company, Mr. Nat Harrison.[7] Baker and Mr. Harrison decided to cut in half the profit from the job and submit a reduced bid, if Louisville would accept it.[8] Mr. Winstandley agreed to Harrison lowering its bid to $687,500 and the new bid was confirmed by telegram.

Of the nine contractors invited to bid, only five submitted bids, as follows:

| | |
|---|---|
| Day & Zimmerman | $1,098,000 |
| Miller Construction Co. | 1,040,227 |
| Power Constructors | 888,000 |
| R. H. Bouligny, Inc. | 864,677 |
| HARRISON | 747,000 |

On April 4, Mr. Baker was informed that Harrison's bid was being considered by Louisville. On April 10, Baker attended a meeting at Louisville's offices to review the equipment that Harrison proposed to use on the job.[9] At the conclusion of the April 10th meeting, Baker was given a document entitled "Addendum No. 1", which he was to fill out and return to Louisville. Baker explained that Addendum No. 1 covered unit prices in case there was a change in the line. The units of work covered by Addendum No. 1 involved attachments to the towers and conductors.[10] Baker testified that in order to supply the unit prices called for in Addendum No. 1, he utilized computations from the "individual crew budget sheets" which he used in preparing the original bid.

Harrison furnished a performance bond[11] and the contract between Louisville and Harrison was signed on April 25, 1968.

Mr. Baker was responsible to Harrison for the project from the first week of August until the last week of October in 1968, when he was relieved, and responsibility for the project was turned over to Robert E. Stoneberger.

The contract contemplated that Harrison would complete the work by March 1, 1969. However, by December of 1968 only 25% of the work had been completed and Harrison was experiencing numerous problems on the job. Toward the end of December Stoneberger ordered the job shut down for two weeks. Concerning the December shut-down, Stoneberger testified: "The money was going out of Miami like it was going out of style. There was no harmony on the job between Louisville Gas & Electric and my supervision." Stoneberger also indicated that Harrison was having diffi-

7. Mr. Winstandley testified that in his conversation with Mr. Baker he did not "entice or encourage him in any way to lower his bid".

8. Baker testified that Nat Harrison anticipated a profit of $119,000 from the job.

9. Evidently, Harrison did not submit its method of wire stringing with the bid and Louisville wanted to know what type of equipment Harrison would use.

10. It appears that the unit prices in Addendum No. 1 refer to additions or subtractions of certain items on the transmission line, while the unit prices requested in the contract are applicable if there was an extension or reduction in the length of the transmission line.

11. In the contract documents Louisville retained an option that allowed it to require the contractor to furnish a performance bond in an amount not exceeding the lump sum price.

culty in working with the towers because "they were not as strong as they appeared to be . . . or we thought they were." [12]

James D. Bondesen, Harrison's superintendent on the Cane Run project, stated that the job was shut down in December because of the muddy right-of-way and equipment difficulties. Indeed, Harrison hired an expert, Mr. Robert L. Smith, to evaluate its difficulties on the job. Smith visited the Cane Run project on December 11, 12 and 13, and concluded that there was a sufficient quantity of equipment, but that its general condition was poor and 25% of it was either totally inoperative or so deficient as to be very inefficient. Smith also found the morale of the crews to be very low due to the lack of positive supervision. Smith further concluded that the job lacked overall direction. Smith stated, however, that Harrison would not have lost any money on the contract if it had followed his recommendations and reorganized. [13]

After the two-week shut-down, a meeting was held between Harrison and Louisville in January of 1969. At this meeting, Harrison agreed to complete the job. Louisville in turn gave Harrison until September to complete the job and meanwhile agreed to supply Harrison with progress reports. Harrison completed the job in October, 1969. The transmission line worked satisfactorily when it was energized in November of 1969.

Although Baker had himself ceased working on the Cane Run project, he was assigned the task one year later, of reviewing the project to ascertain for Harrison what had gone wrong to cause the heavy loss sustained. Baker came up with an explanation which formed the basis for the subsequent lawsuit based upon mistake. That explanation is at once simple and complicated.

It is significant, we believe, that there was no suggestion of mistake until after completion of the project and final billing and payment. Baker testified that by that time, he was unable to locate the working papers and estimates he used in formulating the original bid, documents he claims would, if discovered, support his claim of mistake. Lacking those, Baker proceeded by "working out the project" to locate what he claimed to be a $293,000 error in the original bid. Baker's simplified explanation was that "in compiling the various budget operations, I . . . one of the totals somehow escaped me and I just didn't get them added in, that's all."

■ We find Baker's explanation to be patently unbelievable and in conflict with the very evidence which was offered to prove it. Simply put, Baker's claim is that Harrison, in compiling its bid on the wire stringing contract, forgot to include the costs of stringing the wire. The evidence shows quite convincingly that those costs were in fact included at all times.

In "working out the project" to prove his mistake, Baker claimed that he used computations from the "original crew sheets" of the original bid, since lost, in order to arrive at the figures for unit prices requested in Addendum No. 1. Thus, Baker implied that the unit prices from Addendum No. 1 should have been plugged in and added to the amount of the overall bid, the contract breakdown and the various progress billings. In effect, the "error" was, therefore, failure to include a charge of $7,100 per mile for stringing wire over the 41.3 miles of the project, a total of $293,235.

The contract obligated Louisville to make progress payments to Harrison based upon the latter's estimate of its progress from time to time in completing the project. A total of ten progress billings and one final billing were prepared for Harrison and submitted to Louisville.

---

**12.** Apparently, Harrison was not familiar with stringing conductor through non self-supporting towers, but this is what the contract called for.

**13.** In making this judgment, Smith relied on the unit prices for the installation of conductor that Harrison supplied in the contract.

The billings were prepared by Harrison's office manager on the project, Gorden Bernard, after Bernard had first discussed the matter with Baker. On November 1, 1968 Bernard sent Winstandley a progress billing with a letter stating "Attached please find our contract breakdown based on bid documents issued at time of bidding. This breakdown is being used as a basis for monthly billings for work completed." The attached progress billing was itemized in terms of the accepted bid of $687,500. Therefore, the evidence indicates that the lost documents were at least available to Bernard when he submitted the first progress billing to Louisville. Had such an error in fact existed, it seems almost certain that it would then have been uncovered by Bernard. That the wire stringing charges were included in the billings, and hence in the understood amount of the contract bid, appears particularly from the contract breakdown of the billings themselves:

| Description | Bid Quantity | Unit | Unit Cost | Extension |
|---|---|---|---|---|
| Mobilization | 1 | | 28,000.00 | 28,000 |
| Detail # 1 | 6 | at | 49.00 | |
| 2 | 438 | at | 50.00 | 21,900 |
| 3 | 474 | at | 75.00 | 35,550 |
| 4 | 36 | at | 60.00 | 2,160 |
| 5 | 500 | at | 380.00 | 190,000 |
| 6 | 12 | at | 320.00 | 3,840 |
| 7 | 24 | at | 225.00 | 5,456 |
| 8 | 12 | at | 225.00 | 2,728 |
| 10 | 285 | at | 170.00 | 48,450 |
| 11 | 12 | at | 100.00 | 1,200 |
| 12 | 314 | at | 18.00 | 5,652 |
| 13 | 96 | at | 40.00 | 3,840 |
| Install bundle of 2-954 MCM Conductor | 82.6 | ckt. Mile | 3,200.00 | 264,320 |
| Install two static, 16M alumoweld | 41.3 | Mile | 700.00 | 28,910 |
| Install River Crossing Complete | 2 | at | 15,000.00 | 30,000 |
| De-Mobilize | 1 | at | 15,200.00 | 15,200 |
| | | | Total | 687,500 |

From the foregoing it is evident that the wire stringing costs themselves are included in the billings at a total of $7,100. Instead of billing $7,100 per mile, Bernard broke the billing down to 82.6 circuit miles at $3,200 per mile, or $6,400 per mile for stringing the double bundle of conductors, plus $700 per mile

for installing the alumoweld, or a total of $7,100. This is consistent with the notes given Bernard by Baker, instructing him on how to make out the progress billings, including: "Wire stringing est + — $6,500 — M".

We find that the foregoing proof of the alleged unilateral mistake in this case is anything but clear and convincing, even when viewed in the light most favorable to Harrison. The proof of mistake rests solely on the conclusionary testimony of Baker and his utilization of Addendum No. 1 in reconstructing the bid. Baker's use of Addendum No. 1 to reconstruct the bid is highly questionable in view of the contract breakdown sent to Louisville by Bernard. Bernard's letter accompanying the contract breakdown stated that the breakdown was "based on bid documents issued at the time of bidding." The unit prices in this breakdown are not the same as those found in Addendum No. 1. In addition, the contract breakdown contains wire stringing costs and the total amount of the contract remained at $687,500. Finally, a review of the eleven progress billings shows that during the entire project Harrison did not use unit prices from Addendum No. 1 for the purpose of billing. In view of this evidence, Baker's assertion that Addendum No. 1 unit prices were obtained from the original bid documents cannot carry much weight.

The testimony of Somers and Smith also casts a serious doubt as to the existence of a mistake. Somers' estimate for the wire stringing aspect of the project was $721,075, which is within the range of Harrison's bid. Moreover, Smith concluded that Harrison would not have lost money on the contract if its agents had followed his recommendation. Finally, the testimony at trial concerning Harrison's difficulty with the muddy right-of-way, its equipment, and its inability to efficiently string a conductor through non self-supporting towers may well have caused Harrison's loss, rather than the claimed omission of the wire stringing costs on the wire stringing contract. Therefore, based upon an extensive re-

view of the testimony and documentary evidence at the first trial, we conclude that Harrison failed as a matter of law to establish the existence of a unilateral mistake by clear and convincing evidence.

◼ Additionally, we conclude that there was no showing of fraud or inequitable conduct on the part of Louisville. If, in fact, a mistake did exist, the mere disparity in the range of bids was not sufficient to put Louisville on notice of such a mistake. Louisville's own estimate, prepared by Mr. Somers, was close to the amount of Harrison's bid. While Mr. Winstandley was somewhat surprised by Harrison's bid, this surprise was surely tempered by Mr. Baker's letter accompanying the bid which indicated Harrison's eagerness to do the job, and made promises of cost-saving efficiency. In addition, Winstandley had only one other bid in his possession when he received Harrison's bid. Thus, Winstandley's statement to Baker that "You're in the park" was neither misleading nor inequitable. Harrison had no right to receive advance information on the posture of his bid. Moreover, Louisville's insistence that Harrison obtain a performance bond, urged as indicating Louisville's recognition of mistake, is of little significance. It was required by the contract. Finally, Harrison's own expert, Smith, while indicating he might question Harrison's low bid, did state that such a large bid spread was not unusual. Thus, we conclude that as a matter of law, Harrison has failed to establish by clear and convincing evidence fraud, bad faith, or inequitable conduct on the part of Louisville.

To permit the jury verdict to stand here would be contrary to Kentucky law. Accordingly, we hold the trial court erred in denying Louisville's motion for judgment notwithstanding the jury's failure to agree as to count I. Thus, as to count I in appeal number 73–1469, we

reverse and hold as a matter of law that Louisville was entitled to a judgment of no cause of action.[14]

## APPEAL NUMBER 73–1468

Harrison appeals from the judgment entered in favor of Louisville on count II.

When Harrison rested its case in the first trial, Louisville moved for a directed verdict on count II. In that count, Harrison had sought $977,617 in damages and lost profits, resulting from what it charged was Louisville's breach of contract in failing to supervise and direct the work in accordance with the terms of the contract. The district judge granted the motion. After a careful review of all of the evidence, we affirm.

It was Harrison's theory in count II that the agreement between the parties imposed upon Louisville the general obligation to supervise and direct Harrison's work, much as a general contractor would supervise the work of a sub-contractor. Harrison urged that this obligation was interwoven throughout the entire contract, and relied as well upon two specific provisions.

Pioneer Service & Engineering Company was designated by Louisville as its consulting engineer and field representative, and we agree with Harrison that under the contract any obligation of the engineer was, in fact, that of Louisville. Section 24.3 of the General Conditions of the contract provided:

".3 ENGINEER'S Authority—The ENGINEER shall have general supervision and direction of the work. He has authority to stop the work or direct the order or sequence of the work whenever such action is required to insure the proper execution of the Contract. The ENGINEER shall decide all questions which may arise relative to the conformance of the work with the Plans and Specifications and

14. By disposing of this issue in this manner, it is unnecessary to discuss Louisville's second issue which urges that it is entitled to a new trial on account of error made at the second trial. This disposition also renders it unnecessary to discuss an issue raised in Harrison's appeal number 73–1468, namely that the trial court erred in its allowance of interest to Harrison's judgment on count I.

have authority to reject any work which does not conform to the Contract Documents. The ENGINEER shall rule on questions which may arise between or with other Contractors concerning the work, the use of the premises, or the sequence of operations."

Harrison in its brief also purported to quote in part Section 2.0 of the General Conditions of the contract to the effect that:

". . . the CONTRACTOR shall . . . . construct and complete all work . . . . *subject to the direction, control and approval* of the ENGINEER . . ." (Italics from Harrison's brief)

The complete provision, however, gives a much clearer and accurate understanding of the relationship between Harrison as the contractor and the engineer:

"2.0 ITEMS FURNISHED BY CONTRACTORS

Unless otherwise specified elsewhere in the Contract Documents, the CONTRATOR (sic) shall provide, pay for and deliver all equipment, material, labor, services, *supervision*, construction equipment, transportation, tools and miscellaneous items, and do all things necessary to construct and complete all work shown on the drawings or described in the Specifications, all in accordance with the Contract Documents, subject to the direction, control and approval of the ENGINEER." (Emphasis added)

A plain reading of the contract between the parties convinces us that Harrison was in every respect an independent contractor within the meaning of the contract terms. Under the contract, Harrison was designated as contractor. General Condition 1.5 provided that:

"During the performance of this Contract, the Contractor shall be deemed an independent Contractor and not an agent of the owner."

This is consistent with the other provisions of the contract.

The contract also demonstrates that Harrison was an independent contractor

as that term is defined by Kentucky law. In Borderland Coal Co. v. Burchette, 193 Ky. 602, 237 S.W. 663, 666 (1922), the Court of Appeals of Kentucky held:

"The rule is, if the contractor furnishes his own assistance, and executes the work either entirely according to his own interests or according to plans previously given him by the person for whom the work is to be done, without being subject to the orders of the latter in respect to the details of the work, the persons so engaged will be regarded as an independent contractor, and the laborers he employs will be his servants, and not the servants of the owner of the property."

See also, H. H. Miller Construction Co. v. Collins, 269 Ky. 670, 108 S.W.2d 663, 664; Standard Oil Co. v. Glenn, 52 F.Supp. 755, 757 (W.D.Ky.1943), aff'd. Glenn v. Standard Oil Co., 148 F.2d 51 (6th Cir. 1945).

A paragraph-by-paragraph examination of the contract persuades us, as it did the district judge, that while Louisville reserved to itself through its engineer the right to supervise the project to the extent necessary to determine compliance by Harrison with the contract specifications, it in no way was intended that the contract impose upon Louisville the responsibility for immediate direction and supervision of Harrison's employees and work. See Dempster Construction Company v. Tackett, 215 Ky. 461, 285 S.W. 191 (1926); Diamond Block Coal Co. v. Sparks, 209 Ky. 73, 272 S.W. 31 (1925).

It is apparent from the record that when difficulty was encountered in December, 1968, Louisville increased its efforts to coordinate activities with Harrison, and in particular furnished progress reports which were of assistance to Harrison in the completion of its contract. There is, however, nothing in the contract to indicate that the failure to furnish the reports before then was in any way a breach of its obligations under the contract. The record is barren of any but the most vague and conclusory evidence that Louisville neglected or refused to cooperate with Harrison or

that Harrison, in fact, made any complaint whatsoever in this regard until Harrison added the charge by an amendment to its complaint in the district court litigation in February, 1971. Meanwhile, the work had been complete, ten intermediate progress report billings had been submitted and a final accounting had been reached as of October 1, 1969. To be considered with the total absence of evidence of breach of contract on the part of Louisville is the cogent evidence, mentioned earlier, which points to Harrison's own mismanagement and neglect as the prime source of its loss on the contract. We conclude that the district judge properly directed a verdict in favor of Louisville on count II of the complaint.

### CONCLUSION

Accordingly, judgment of the district court upon the verdict of the jury in favor of Harrison is reversed and the case remanded with instructions to enter judgment on count I in favor of Louisville.

The judgment of the district court entered in favor of Louisville on count II of the complaint is affirmed.