33 F.3d 727
 HANOVER INSURANCE COMPANY, Plaintiff-Appellee, Intervening
Defendant-Appellee,
Security Insurance Company Of Hartford (93-5442),
Intervening Plaintiff-Appellant,
v.
AMERICAN ENGINEERING COMPANY; Mahan Corporation; American
Engineering Company d/b/a Amtex Engineering Company, Texas;
American Engineering Company, in Virginia and North
Carolina; Adams Engineering Company; E.B. Gaither; Homer
M. Walker; Henry C. Rogers; D. Martin VanMeter; Stephen
L. Mulloy; James David Sigler; James F. Adams; W. Wayne
Roggenkamp; Richard L. Peck; Douglas L. Locker (93-5440),
Defendants-Appellants.
 Nos. 93-5440, 93-5442.
 United States Court of Appeals,
Sixth Circuit.
 Argued May 13, 1994.
Decided Sept. 15, 1994.
 
 Larry Deener (argued), J. Denis Ogburn (briefed), Landrum & Shouse, Lexington, KY, for plaintiff-appellee.
 J. Stephen McDonald, Newberry, Hargrove & Rambicure, D. Duane Cook (argued and briefed), Lexington, KY, for defendants-appellants.
 Robert M. Brooks (argued), James P. Grohmann (briefed), Boehl, Stopher & Graves, Louisville, KY, for intervenor-appellant.
 Before: RYAN and NORRIS, Circuit Judges; and KRUPANSKY, Senior Circuit Judge.
 KRUPANSKY, Senior Circuit Judge.
 
 
 1
 This diversity action concerned the scope of insurance coverage afforded by commercial general liability policy no. ZDL 278 88 76 ("the CGLP") issued by appellee Hanover Insurance Company ("Hanover") to appellant American Engineering Company ("American"). Hanover sought judicial reformation of the CGLP policy to incorporate an allegedly erroneously omitted rider (ISO Form CG 22 43 11 85) ("the rider" or "the endorsement") which would purportedly exclude coverage for any professional negligence claim made against American. Appellant Security Insurance Company of Hartford ("Security"), American's professional liability insurance carrier, initiated a cross-complaint in intervention against Hanover which prayed for reimbursement of certain amounts paid in settlement of certain tort claims against American, as well as a judicial determination of priority of coverage. The district court, on cross motions for summary judgment, reformed the CGLP to include the pertinent rider and accordingly dismissed the entire action on the theory that the rider precluded coverage for the types of claims against American at issue in this case.
 
 
 2
 At all relevant times, American was a partnership engaged in the business of providing professional engineering services. In 1987, both its Maryland Casualty Co. general liability policy and its Fireman's Fund umbrella policy expired. Through an insurance broker, William F. Cowgill, Jr. ("Cowgill"), American acquired replacement policies underwritten by Hanover. Although Cowgill had not sought professional negligence coverage for American, the $1 million Hanover CGLP in fact contained no professional liability exclusion.[1] The policy was renewed in this form for additional annual periods in 1988 and 1989.
 
 
 3
 At the time of American's acquisition of the Hanover CGLP in 1987, American participated in the construction of a bridge as a subcontractor under a master contract between the state of Kentucky and Florence & Hutchinson, Inc. ("FHI"). FHI served as the general engineering consultant respecting a large state-sponsored highway and bridge construction project. American, as FHI's subcontractor, assumed general engineering consultant responsibilities respecting the construction of a bridge on AA Highway at Twelve Mile Creek in Campbell County. American devised the bridge and in turn subcontracted Janssen Spaans & Associates ("JSA") to design concrete beams and girders for the bridge, and hired Prestress Services, Inc. ("PSI") to fabricate those concrete beams and girders.
 
 
 4
 Also in 1987, on an unrelated project, the Illinois Tollway Authority predicated the award of work to American upon its attainment of a specialized professional errors and omissions policy. American accordingly obtained such professional negligence coverage in the amount of $1 million from a division of Security (DPIC Companies/Orion Group). That policy insured solely against professional liability; it expressly excluded general liability coverage.
 
 
 5
 On June 22, 1989, Campbell County bridge concrete beam no. 201 failed, tragically killing two workmen and injuring three others. Subsequently, effective October 1, 1989, Hanover amended the CGLP to integrate the rider.[2] Between late 1989 and early 1993, four tort damages actions were initiated in Kentucky state court against, inter alia, FHI, PSI, JSA, and American, which sought multimillion dollar recoveries. Those complaints generally averred, inter alia, that American acted negligently, either through its own actions or through the conduct of other defendants with which it acted in concert, respecting the design of bridge beam no. 201.
 
 
 6
 On June 27, 1989, American tendered its defense to Hanover under the CGLP. In response, Hanover, by letter dated January 10, 1990 from Claims Supervisor John R. Sparks ("Sparks"), denied coverage and refused to defend. The Sparks letter did not reference the omitted rider but instead buttressed the decision by citation to a provision of the CGLP which Hanover later conceded during discovery was irrelevant to the claims.[3]
 
 
 7
 On November 8, 1991, Hanover filed a diversity action in the Eastern District of Kentucky against American requesting reformation of the CGLP, alleging, among other things, that the parties had not intended the policy to cover professional liability and that the appropriate endorsement had been omitted by mutual mistake. On December 9, 1991, American counterclaimed for a declaration that the CGLP covered liability for professional negligence and that the Security policy afforded coverage in excess of the Hanover policy. American also sought recovery of $1,450,000 paid by itself and Security in settlement of American's exposure in the tort suits. On August 7, 1992, Security filed a complaint in intervention against Hanover which advanced an equitable subrogation theory and which sought a declaration that its policy covered only liabilities in excess of those insured by the Hanover CGLP. Security demanded reimbursement of $1,000,000 (the policy limit) advanced by it in partial discharge of American's settlement obligations. On September 18, 1992, American amended its counterclaim against Hanover to incorporate allegations of failure to investigate the claims, refusal to defend, breach of the covenant of good faith and fair dealing and good faith obligations, and use of economic coercion to avoid its contractual commitments.
 
 
 8
 After completion of discovery, the district court on February 19, 1993 ruled upon the parties' cross-motions for summary judgment. The court granted Hanover's motion to reform the CGLP to include the rider, denied the motions of American and Security, and dismissed the entire action.
 
 
 9
 Under Federal Rule of Civil Procedure 56(c), "[t]he [summary] judgment sought shall be rendered forthwith if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to judgment as a matter of law."
 
 
 10
 On summary judgment, all reasonable inferences drawn from the evidence must be viewed in the light most favorable to the parties opposing the motion. Matsushita Electric Industrial Co., Ltd. v. Zenith Radio Corp., 475 U.S. 574, 586-88, 106 S.Ct. 1348, 1356, 89 L.Ed.2d 538 (1986). However, "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party, there is no 'genuine issue for trial.' " Id. The substantive law determines which facts are "material" for summary judgment purposes. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 247-49, 106 S.Ct. 2505, 2510, 91 L.Ed.2d 202 (1986). The same evidentiary standard of proof applies on summary judgment as would apply at trial on the merits. Id. at 252-53, 106 S.Ct. at 2512.
 
 
 11
 On appeal, the circuit court reviews a grant of summary judgment de novo, using the same Rule 56(c) standard as the district court. Hansard v. Barrett, 980 F.2d 1059, 1061 (6th Cir.1992). However, the denial of a motion for summary judgment is reviewed for abuse of discretion. Pinney Dock and Transport Co. v. Penn Cent. Corp., 838 F.2d 1445, 1472 (6th Cir.), cert. denied, 488 U.S. 880, 109 S.Ct. 196, 102 L.Ed.2d 166 (1988). Reviewing de novo the district court's grant of summary judgment in favor of Hanover, this panel must conclude that summary judgment standards had not been satisfied and therefor the lower court's disposition was erroneous and must be reversed.
 
 
 12
 Substantive Kentucky law applies in this diversity case. E.g., Miller's Bottled Gas, Inc. v. Borg-Warner Corp., 955 F.2d 1043, 1049 (6th Cir.1992); Nat Harrison Assoc., Inc. v. Louisville Gas & Elec. Co., 512 F.2d 511, 513 (6th Cir.), cert. denied, 421 U.S. 988, 95 S.Ct. 1992, 44 L.Ed.2d 478 (1975). In that state, the construction of insurance contract provisions comprise questions of law for the court, unless disputed facts are involved. Perry's Adm'x v. Inter-Southern Life Ins. Co., 254 Ky. 196, 71 S.W.2d 431, 433 (1934). Under Kentucky law, insurance policies are strictly construed against the insurer, especially where, as here, the insurance company drafted the document in its entirety. Wolford v. Wolford, 662 S.W.2d 835, 838 (Ky.1984). In Kentucky, "exceptions and exclusions should be strictly construed to make insurance effective." Davis v. American States Ins. Co., 562 S.W.2d 653, 655 (Ky. App. 1978).
 
 
 13
 In the case at bench, in the absence of the rider, the Hanover CGLP on its face clearly included claims against American which germinated from the professional errors or omissions of either itself, or of others such as subcontractors which might give rise to American's vicarious liability, because the policy did not expressly exclude such claims.[4] If the rider, by reformation, is deemed to constitute an integral portion of the policy, such claims would be excluded by its plain language.[5]
 
 
 14
 In Kentucky, a party seeking reformation must prove by clear and convincing evidence that a "mutual mistake" occurred. Deskins v. Leslie, 387 S.W.2d 596, 597 (Ky.1965); Nat Harrison, supra, 512 F.2d at 513. In the case at bench, in order for the summary judgment in favor of Hanover to survive review, Hanover must have proved by clear and convincing evidence, to the degree required by summary judgment standards, that both Hanover and American actually intended, at the time that the insurance agreement was made, that a specific professional liability exclusion should be integrated into the policy, or that American knew or should have known that Hanover intended to include such an endorsement. Id. Moreover, Hanover must prove by clear and convincing evidence, such that no rational finder of fact could conclude otherwise, that the precise terms of the endorsement had been approved by both Hanover and American, or that American knew or should have known the precise terms of such a rider which it knew or should have known Hanover intended to include within the policy. Campbellsville Lumber Co. v. Winfrey, 303 S.W.2d 284, 286 (Ky.1957). Therefor, Hanover must prove not only that American knew or should have known that Hanover intended to include a professional liability exclusion, it must also prove that American knew or should have known the exact scope of that restriction--including that the rider would eliminate coverage for American's vicarious liability for acts of professional negligence by its subcontractors, as well as liability for its own active professional negligence.[6]
 
 
 15
 Reviewing the summary judgment grant de novo, this court cannot say that this standard had been satisfied. Respecting Hanover, the evidence was not so clear as to preclude a question of fact as to whether it intended to include the rider at the time that the CGLP was purchased by American. While some evidence supported the conclusion that the omission of the endorsement occurred "inadvertently" during the assembly of the policy, contrary reasonable inferences must defeat such proof on summary judgment in light of the "clear and convincing" proof which must be produced by Hanover. The fact that this restriction was customarily embodied in a separate rider as opposed to a term of the master policy suggests that not all general liability policies issued by Hanover were intended by Hanover to exclude professional liability coverage. Hanover issued the policy and twice renewed it without the endorsement, even though the predecessor Maryland Casualty policy contained such an exclusion, and even though the Hanover umbrella policy issued to American included the endorsement. Only after assertion of the accrued tort claims did Hanover seek to amend the policy to incorporate the endorsement. Upon American's tender of defense of the tort suits to Hanover, the insurer did not rely upon the allegedly erroneously-omitted endorsement as a justification for denial of coverage but rather urged a different policy term (which it later conceded to be inapplicable), as developed above.
 
 
 16
 Reviewing the evidence from the perspective most favorable to American, it was not clear that American knew or should have known that Hanover intended to include a professional liability exclusion endorsement. The evidence was even less compelling that American knew or should have known that such an endorsement would exclude coverage for the professional negligence of its subcontractors. The testimony of various partners of American revealed that they either believed that all professional liability would be covered by the policy or that at least exposure arising from the professional negligence of American's subcontractors would be insured, or that they had not considered the question at the time that the insurance was procured.[7] William Cowgill, American's insurance broker who secured the Hanover CGLP, testified that he did not intend the policy to cover American's professional negligence, but that he believed that it would insulate American from the actionable conduct of its subcontractors. Gwathmey Tyler, American's insurance broker who obtained the Security policy, avowed that he understood commercial general liability policies of the type issued by Hanover to ordinarily cover subcontractor negligence charged against an insured contractor.
 
 
 17
 It was undisputed that, prior to American's tender of the defense of the tort claims to Hanover, no one representing Hanover ever informed anyone at American that a professional liability exclusion should have been incorporated into the CGLP, nor did anyone inform American of the scope of such a purported limitation. The fact that the Hanover umbrella policy incorporated such a rider was not dispositive, as it could reasonably support either (1) the inference that the insured rationally believed that the CGLP was intended by Hanover to cover professional liability whereas the umbrella policy was not so intended, or (2) the inference that the insured should have known that the omission of the exclusion on the CGLP must have resulted from inadvertence.
 
 
 18
 The weight to be accorded the evidence in favor of American and Security, and the relative significance of the contrary evidence of record beneficial to Hanover, must be determined by the trier of fact after trial in the light of the totality of the evidence. In reforming the Hanover CGLP policy to Hanover's advantage on summary judgment, and dismissing the entire action, the district judge improperly weighed disputed evidence, decided questions of credibility, and drew inferences about the knowledge and intent of parties from conflicting evidence adversely to the respondent. These are exclusive functions of the trier of fact to be discharged after consideration of the live testimony and all other evidence presented in an adversarial trial environment,[8] at least where more than a mere scintilla of evidence offered by the respondent created a dispute respecting the purportedly undisputed material facts relied upon by the movant, such that a finder of fact could reasonably find in favor of the respondent, as was the case here. Anderson v. Liberty Lobby, 477 U.S. 242, 251-55, 106 S.Ct. 2505, 2512-13, 91 L.Ed.2d 202 (1986).
 
 
 19
 Although the lower court erroneously awarded summary judgment to Hanover, it did not, in light of the conflicting evidence, abuse its discretion by denying American's and Security's cross motions for summary judgment against Hanover.
 
 
 20
 Accordingly, the summary judgment of the district court in favor of Hanover is hereby REVERSED, and the case is hereby REMANDED to the district court for trial of all claims and for such other appropriate proceedings which are consistent with this opinion.
 
 
 
 [1]
 By contrast, the Maryland Casualty general liability policy (which the Hanover CGLP replaced) integrated the following professional liability endorsement:
 It is agreed that the insurance does not apply to bodily injury or property damage arising out of the rendering of or the failure to render any professional services by or for the named insured, including:
 
 
 [1]
 The preparation or approval of maps, plans, opinions, reports, surveys, designs, or specifications; and
 
 
 [2]
 Supervisory, inspection, or engineering services
 Although the professional liability exclusion (ISO CG 22 43 11 85) was omitted from the Hanover general liability policy, it was included in the contemporaneously issued Hanover umbrella policy. That endorsement read as follows:
 This insurance does not apply to "bodily injury," "property damage," "advertising injury" or "personal injury" arising out of the rendering of, or failure to render professional services, by or for you, including:
 
 
 [1]
 The preparing, approving, or failing to prepare or approve maps, drawings, opinions, reports, surveys, change orders, designs or specifications; or
 
 
 [2]
 Supervisory, inspection or engineering services
 Coverage under the umbrella policy was not at issue in this appeal.
 
 
 [2]
 The version of the endorsement incorporated by amendment into the CGLP in 1989 was identical to that included in the Hanover umbrella policy in 1987, quoted in note 1 above, except that where the umbrella policy rider connected exclusions 1. and 2. with the disjunctive "or," those exclusions were joined by the conjunctive "and" in the CGLP endorsement
 
 
 [3]
 The pertinent portion of the Sparks letter read as follows:
 As our policy is a general liability policy and not a professional liability policy it has been our contention that any coverage and/or defense for this litigation should be provided by your professional liability carrier. All counts in the complaint alleging negligence against American Engineering arise from a breach of professional duties which would not be covered under the general liability policy.
 The commercial general liability policy in question contains an exclusion which provides as follows:
 This insurance does not apply to:
 "b. "bodily injury" or "property damage" for which the insured is obligated to pay damages by reason of the assumption of liability in a contract or agreement." J.App. at 115-6.
 Hanover underwriter Elizabeth Hunt, who wrote the policy, attested that the policy exclusion quoted above was immaterial to American's tender. Sparks himself acknowledged at deposition that he knew of no contractual liability asserted against American by the tort claimants which might be precluded from coverage by the clause quoted above.
 
 
 [4]
 Generally, the CGLP insured American against all bodily injury and property damage claims resulting from an occurrence within the policy period, excepting only enumerated exclusions. See J.App. at 47-9
 
 
 [5]
 See the language quoted in note 1 supra, which provides, inter alia, for the exemption of all liability exposure arising out of the performance or omission of any professional service "by you or for you." (Emphasis added)
 
 
 [6]
 In the instant case, after full discovery, no evidence supported the conclusion that American had committed any active negligence in the design in the bridge beam. Rather, the expert reports exonerated American of any direct responsibility for the disastrous accident; no expert attributed any degree of causation to any aspect of the bridge design. See the April 18, 1991 report of Wiss, Janney, Elstner Associates Inc. (commissioned by American), which concluded that failure of the beam resulted primarily from negligent construction of the beam and perhaps flowed in part from a faulty design of the beam, J.App. at 254-92; and see the March 29, 1991 report by Raths, Raths & Johnson (submitted by FHA, the general consultant for the entire project), which attributed the collapse of the beam to defective construction of the beam and to inadequate inspection by the Kentucky Department of Highways. J.App. at 294-327. Nothing in the record on summary judgment contradicted this properly qualified expert evidence
 
 
 [7]
 American's managing partner, E.B. Gaither, attested that he believed that the CGLP would cover all professional liability, including vicarious liability for the conduct of subcontractors, because no one ever advised him that such exposure was excluded. James D. Sigler, another principal of American, testified that he did not form an opinion as to whether the CGLP would protect against American's professional negligence, but he did believe that that policy shielded American from subcontractor errors and omissions liability
 
 
 [8]
 "Credibility determinations, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge, whether he is ruling on a motion for summary judgment or for a directed verdict. The evidence of the non-movant is to be believed, and all justifiable inferences are to be drawn in his favor." Anderson v. Liberty Lobby, 477 U.S. 242, 255, 106 S.Ct. 2505, 2513, 91 L.Ed.2d 202 (1986)