**Wally LANGLEY, Plaintiff–Appellant,**

v.

**CREDIT SUISSE FIRST BOSTON CORP., Prudential Securities, Inc., and Purchasepro.com, Inc., Defendants–Appellees.**

No. 02–5911.

United States Court of Appeals, Sixth Circuit.

Jan. 9, 2004.

Don A. Pisacano, Rambicure, Miller & Pisacano, Lexington, KY, for Plaintiff–Appellant.

John A. West, Greenebaum, Doll & McDonald, Covington, KY, Jeffrey A. Richmond, Jerry L. Marks, Heller, Ehrman, White & McAuliffe, Los Angeles, CA, for Defendant.

William W. Allen, Gess, Mattingly & Atchison, Mindy G. Barfield, Dinsmore & Shohl, Lexington, KY, Christopher H. McGrath, Brobeck, Phleger & Harrison, San Diego, CA, for Defendants–Appellees.

Before COLE and CLAY, Circuit Judges; and QUIST, District Judge.[*]

CLAY, Circuit Judge.

Plaintiff Wally Langley appeals the district court's order of May 22, 2001, dismissing his breach of contract claims as barred by Kentucky's parol evidence rule, and the order of June 13, 2002, denying leave to file his third proposed amended complaint and granting summary judgment to Defendant Prudential Securities, Inc. on his second amended complaint. The orders of the district court are AFFIRMED.

## I.

### A. Facts

Wally Langley is an investor from Lexington, Kentucky. Langley is a member of a group of thirteen original shareholders of PurchasePro.com, Inc., a Las Vegas-based Internet company; these shareholders are known as the Lexington Group. PurchasePro went public through an initial public offering ("IPO") of stock on September 15, 1999. In that offering, members of the Lexington Group agreed to a

---

[*] The Honorable Gordon J. Quist, United States District Judge for the Western District of Michigan, sitting by designation.

so-called "lock up" of their shares, meaning they committed not to sell their shares for a period of days after the IPO, i.e., until March 13, 2000. A lock-up prevents shareholders from selling and thereby affecting the market price of shares being sold by the underwriters immediately after the beginning of a public offering. Langley acquired 300,000 shares in the IPO.

In early December of 1999, Langley and other members of the Lexington Group were given the opportunity to participate in a secondary public offering ("SPO") of PurchasePro stock. PurchasePro distributed a packet of written information that described the terms of the proposed SPO to Langley and other members of the Lexington Group. Pursuant to this proposal, SPO participants would be permitted to sell some of their PurchasePro shares as long as they agreed to extend the lock-up beyond March, 13, 2000, for 90 days after the effective date of the secondary offering. The SPO packet included a Statement of Election and Waiver which Langley admits he signed and returned prior to the SPO. The Waiver Statement provided, in relevant part:

### STATEMENT OF ELECTION AND WAIVER

\*        \*        \*        \*        \*        \*

1. The undersigned hereby requests that [PurchasePro] include the following number of shares of Common Stock owned and held by the undersigned in the Offering . . .:

_____ Shares[ ]

\*        \*        \*        \*        \*        \*

3. In consideration of the Underwriters' agreement to purchase and make the Offering, in order to induce them to act as Underwriters in connection with the Offering, and for other good and valuable consideration, receipt of which is hereby acknowledged, the undersigned hereby irrevocably agrees that, for a period of 90 days after the date of the Prospectus relating to the Offering, the undersigned will not directly or indirectly offer, sell, contract to sell, grant any option to purchase, or otherwise sell or dispose of any shares of Common Stock or any securities convertible into, exchangeable or exercisable for any rights to purchase or acquire Common Stock owned directly by the undersigned or with respect to which the undersigned has the power of disposition, other than (i) as a gift or gifts, provided the donee or donees thereof agree to be bound by this restriction, or (ii) with the prior written consent of Prudential Securities Incorporated alone or both of the Representatives together; provided that the foregoing agreement shall terminate if the Offering has not commenced on or before June 1, 2000.

\*        \*        \*        \*        \*        \*

The foregoing agreement will be binding on the undersigned and the respective successors, heirs, personal representatives, and assign of the undersigned notwithstanding any prior agreements relating the [sic] this matter and further agree and consent to the entry of stop-transfer instructions with [PurchasePro's] transfer agent against the transfer of shares of Common Stock held by the undersigned except in compliance with this paragraph 3.

(J.A. 140–41.)

On December 6, 1999, Charles J. Lisle, an attorney acting on behalf of the Lexington Group, advised PurchasePro and PurchasePro's underwriters (Credit Suisse First Boston Corporation and Prudential Securities Inc.) that the Lexington Group would not agree to the proposed extended lock-up. During a conference call, Patrick

Devine, an attorney purporting to speak for PurchasePro and its underwriters, advised Lisle and the Lexington Group members that PurchasePro and its underwriters agreed that the Lexington Group would not be subject to the extended lock-up as a condition of participation in the secondary offering. Lisle then advised members of the Lexington Group by letter that "despite what the [SPO] materials say, no additional lock-up will be required in connection with sales of investor shares in the secondary offering." (J.A. 138.) Lisle further recommended that investors cross out paragraph 3 of the Waiver Statement and write the words "per Patrick Devine 12/6/99" next to the paragraph 3. (J.A. 138.) Lisle attached a sample, modified Waiver Statement to his letter which illustrated how the investors were to effect this change.

Langley alleges that in December of 1999 he executed and delivered a modified version of the Waiver Statement that reflected the deletion of the lock-up provision; however, neither Langley, nor any of the other parties, have this document in their possession. In January 2000, before the SPO, PurchasePro realized that it did not have Langley's Waiver Statement, and, therefore, a secretary from the company contacted Langley. According to Langley, the secretary told him that PurchasePro was making final preparations for the SPO, but that they did not have Langley's Waiver Statement. Langley told the secretary that he already had sent in the executed Waiver Statement, but, since PurchasePro did not have it, she asked Langley "to redo the form and send it in to her." (J.A. 231.) Langley acquired a blank Waiver Statement from Purchase-Pro—the same form he had received in the December 6, 1999, SPO packet—and then wrote the number of shares he wanted to sell in paragraph 1 (50,000), signed the form and sent it to PurchasePro; he never

even considered crossing out paragraph 3. Langley claims that he inadvertently executed the "second" Waiver Statement, assuming it was consistent with the version of the Waiver Statement that Langley alleges he previously had modified and sent to PurchasePro in December.

In February 2000, Langley sold approximately 50,000 shares in the secondary offering for approximately $3.7 million, and he also arranged for the sale of an additional 230,000 shares of his PurchasePro stock on March 13, 2000, the expiration date of the initial lock up period. On March 20, 2000, Langley contacted Prudential Securities, Inc. ("Prudential"), one of the brokers who held his PurchasePro stock. After directing Prudential to sell the shares, Prudential advised Langley that it was unable to comply because the stock was locked up. Prudential further advised Langley that he should contact Credit Suisse First Boston Corporation ("First Boston"), which by that time had become the lead underwriter.

Langley sought PurchasePro's assistance in releasing the shares from the lock-up provision. In response, Purchase-Pro advised Langley that First Boston was insisting that the lock-up be continued based on his signature on the Waiver Statement. Langley alleges that he lost millions of dollars as a result of his inability to sell the PurchasePro shares on March 20, 2000.

## B. Procedural History

On November 15, 2000, Langley filed a complaint in district court against First Boston and Prudential. The complaint alleged two counts of breach of contract against Defendants for refusing to permit Langley to sell his PruchasePro stock on March 20, 2000. The complaint alleged that Defendants breached an oral agree-

ment that Langley would not be bound by the Waiver Statement's "lock-up" provision which prohibited the sale of his Purchase-Pro shares until well after March 20, 2000. Both Defendants moved to dismiss the complaint for failure to state a claim, but, on February 22, 2001, Langley filed an amended complaint before the court could rule on the motion. The amended complaint re-alleged the breach of contract claims against First Boston and Prudential and added a claim that Langley had executed the Waiver Statement based upon Defendants' fraud or inequitable conduct. In particular, Langley claimed that Defendants misrepresented to him that the Waiver Statement he had signed was a replacement form for the original Waiver Statement, which Langley claims he had modified by deleting the lock-up provision and sent to Defendants. Both Defendants moved to dismiss the first amended complaint for failure to state a claim. On May 22, 2001, the district court ruled that the breach of contract claims were barred by Kentucky's parol evidence rule and dismissed them with prejudice, but denied the motion to dismiss the fraud claim.

In October 2001, Langley moved for leave to file his second amended complaint. Langley sought to add PurchasePro as a defendant. The complaint also alleged the following claims: (1) reformation of the second Waiver Statement to delete the lock-up provision; (2) breach of the contract, as reformed; (3) rescission of the second Waiver Statement; (4) breach of Prudential's duties under its brokerage account relationship with Langley for refusing to follow his instructions to sell the 94,000 shares of PurchasePro stock held by Prudential on Langley's behalf; (5) conversion against all Defendants; (6) "tortious interference" by all Defendants with Langley's ability to sell the 230,000 shares of PurchasePro stock; and (7) fraud by all Defendants. Defendants Prudential and

First Boston opposed the motion to amend. On November 13, 2001, before the court could rule, Langley attempted to withdraw his fraud claim without prejudice so that he could re-file the fraud count if additional supporting facts were revealed during discovery. On November 14, 2001, Langley agreed to withdraw the conversion and tortious interference counts. First Boston and Prudential then moved for summary judgment on the fraud claim from the first amended complaint. The district court denied Langley's motion to dismiss the fraud claim without prejudice, and instead granted Defendants' motions for summary judgment on the fraud claim with prejudice.

The district court granted Langley's motion for leave to file his second amended complaint on December 21, 2001. Because of Langley's voluntary withdrawal of certain claims and the grant of summary judgment on the fraud claim, the court limited the second amended complaint to the first four counts for reformation, breach of contract, rescission and breach of brokerage duties. All three Defendants subsequently moved for summary judgment on the second amended complaint. Three weeks later, on February 21, 2002, Langley moved for leave to file his third amended complaint. Langley's motion consisted of little more than one page of argument in which he stated that new information obtained during discovery established that all Defendants "had direct knowledge of Plaintiff's agreement with PurchasePro that Plaintiff would not be subject to an extended 90–day lock up if he chose to participate in the Second Public Offering." (J.A. 349.) Although the proposed third amended complaint alleged no less than 13 "new" causes of action, the motion itself contained no legal argument justifying the addition of these claims. Instead, Langley referred the court to his

opposition to the motions for summary judgment for the legal bases for asserting the additional claims.

On June 13, 2002, the district court denied Langley leave to file his third amended complaint because of "prejudice to the defendants, dilatory motive, and futility of proposed claims." (J.A. 22.) The district court found that Langley's motion was "procedurally improper" and confusing and misleading because his supporting legal argument consisted of a one-page memorandum that incorporated by reference the arguments contained in his opposition to Defendants' motions for summary judgment. The court also found that Langley never explained why the proposed new claims were not included in the original complaint or the first and second amended complaints. The court held that the new information to which Langley referred added nothing to the factual record. The court also was bothered by the fact that Langley had sought leave to file the third amended complaint only after Defendants had moved for summary judgment. The district court then granted Defendants summary judgment on the second amended complaint.

Langley filed his notice of appeal on July 15, 2002. The notice of appeal sought review of the orders of May 22, 2001, dismissing the breach of contract claims as barred by Kentucky's parol evidence rule, and of June 13, 2002, denying leave to file the third amended complaint and granting summary judgment to Defendants on the second amended complaint. On October 29, 2002, this litigation was stayed with respect to PurchasePro because it had filed for bankruptcy protection. Further, on February 11, 2003, First Boston was dismissed as a party to this appeal, upon joint motion of the parties. Accordingly, Prudential is the only Defendant involved with this appeal.

## II.

### A. Denial of motion for leave to file a third amended complaint

After a responsive pleading has been filed to a complaint, Federal Rule of Civil Procedure 15(a) provides that a party may file an amended complaint "only by leave of court or by written consent of the adverse party." Fed.R. Civ. P. 15(a). Rule 15(a) provides that such "leave shall be freely given when justice so requires." *Id.* Rule 15 "reinforce[s] the principle that cases 'should be tried on their merits rather than the technicalities of pleadings,'" *Moore v. City of Paducah,* 790 F.2d 557, 559 (6th Cir.1986) (quoting *Tefft v. Seward,* 689 F.2d 637, 639 (6th Cir.1982)), and therefore assumes "a liberal policy of permitting amendments." *Ellison v. Ford Motor Co.,* 847 F.2d 297, 300 (6th Cir. 1988). "Except in cases where the district court bases its decision on the legal conclusion that an amended complaint could not withstand a motion to dismiss, [this Court] review[s] a district court's denial of leave to amend for abuse of discretion." *Morse v. McWhorter,* 290 F.3d 795, 799 (6th Cir. 2002) (citing *Monette v. Elect. Data Sys. Corp.,* 90 F.3d 1173, 1188 (6th Cir.1996)). A district court abuses its discretion when it "fails to state the basis for its denial or fails to consider the competing interests of the parties and likelihood of prejudice to the opponent." *Moore,* 790 F.2d at 559.

The district court below stated the basis for denying Langley leave to file its third amended complaint, finding that amendment (1) would prejudice the defendants, (2) stemmed from a dilatory motive on Langley's part, and, in any event, (3) would be futile. Thus, the first question is whether the district court abused its discretion in concluding that Langley was dilatory and/or that amendment would have prejudiced Defendants. If the dis-

trict court abused its discretion, the next question, involving a *de novo* standard of review, is whether amendment of Langley's complaint would have been futile.

■ . There is considerable evidence that Langley was dilatory in advancing the claims set forth in the proposed third amended complaint. He followed a very predictable pattern of attempting to amend his complaint whenever his lawsuit was threatened with dismissal, forcing Defendants and the court into repetitive motion practice concerning the same factual allegations. Langley has proffered no justification for this pattern other than the purported ineptitude of his prior attorney. *See Appellant's Br.* at 18–19. Nevertheless, the law in this circuit reveals that the district court abused its discretion in denying leave to amend on this ground because Defendants would not have been sufficiently prejudiced had the court permitted amendment.

Our decision in *Moore, supra,* is instructive. There, the plaintiff originally brought suit under 42 U.S.C. § 1985, and the defendant subsequently filed a motion to dismiss. *Moore,* 790 F.2d at 558. The plaintiff sought leave to file a second amended complaint almost two years later, and the court granted the motion. *Id.* After the pre-trial conference, the plaintiff sought leave to file a third amended complaint wherein he would substitute a § 1983 claim for the § 1985 claim. *Id.* The district court denied the motion to amend, finding no excusable basis for the plaintiff's delay in recognizing that § 1983 was the proper basis for his claim. *Id.* at 559. On appeal, this Court held that denial of the motion to amend was an abuse of discretion because there was no "significant showing of prejudice" to the defendants. *Id.* at 562. "[U]njustified delay alone" could not serve as the basis for denial of the motion for leave to amend.

*Id.* at 559, 562. *See also Tefft,* 689 F.2d at 638, 639 n. 2 (holding it was an abuse of discretion to deny leave to file third amended complaint sought four years after original complaint had been filed and after an appeal to, and remand from, the Court of Appeals: "Delay that is neither intended to harass nor causes any ascertainable prejudice is not a permissible reason, in and of itself, to disallow an amendment of a pleading.") (citations omitted).

In the instant case, the district court made only a conclusory finding of prejudice to Defendants, never indicating with specificity what that prejudice was. There was no indication that Defendants were faced with the prospect of duplicative discovery because the factual basis of Langley's complaint largely remained the same. In all likelihood, the prejudice the court had in mind was the constant motion practice to which Langley had subjected Defendants and the court. This form of prejudice, however, was exactly the same type of prejudice to which the defendants in *Moore* had been subjected. Thus, Langley's dilatory tactics, all of which preceded the summary judgment disposition, did not prejudice Defendants or the district court to the degree required for denial of a motion for leave to amend. *Compare Morse,* 290 F.3d at 800 ("We recognize [Defendant] will be inconvenienced by another round of motion practice, but given the magistrate's recommendation [to dismiss the complaint without prejudice to plaintiff's right to file an amended complaint] and the competing interests of the proposed class, such inconvenience does not rise to the level of prejudice that would warrant denial of leave to amend [by the district court]") *with Parry v. Mohawk Motors of Mich., Inc.,* 236 F.3d 299, 306–07 (6th Cir.2000) (Clay, J.) (upholding denial of leave to amend complaint where amendment was sought more than a year after

original complaint was filed, summary judgment had been granted to Defendants two months earlier and plaintiff was attempting to add a new legal theory) *and Troxel Mfg. Co. v. Schwinn Bicycle Co.,* 489 F.2d 968, 971 (6th Cir.1973) (holding that district court did not abuse its discretion in denying leave to amend because the plaintiff had proceeded upon one theory through the Court of Appeals where it lost and wanted to repeat the cycle again by alleging a new theory of recovery; finding that cost to defendant of having to defend against new theory was sufficient prejudice).

The analysis does not end here, because the district court also held that granting Langley leave to file a third amended complaint would have been futile. *See Parry,* 236 F.3d at 307 (affirming denial of leave to amend because amendment would not have stated a claim for relief). As noted, Langley's proposed third amended complaint contained thirteen counts, many of which had not been presented in any form in his prior three complaints (*e.g.,* securities law violations, UCC violations, negligent misrepresentation). Despite the comprehensive changes to the legal theories underlying his case, Langley submitted only a one-page legal memorandum in support of his motion to amend. That memorandum incorporated by reference his arguments made in opposition to Defendants' summary judgment motions. Even assuming that the district court was obligated to look to Langley's other briefs to find support for his motion to amend, on appeal Langley has proffered no argument about why it would not have been futile to amend the complaint with these new claims. Langley merely has referred the Court to his opposition to Defendants' motions for summary judgment. *See Appellants' Br.* at 19–20 ("As Mr. Langley stated in response to the Defendants' motions for summary judgment, none of the new claims are barred by the parol evidence rule."). The only "new" claim about which he has proffered any argument involves the alleged breach of contract—specifically, the claim that the Waiver Statement Langley signed gave Prudential the authority to waive the lock-up provision and Prudential's failure to grant a waiver was wrongful. *See id.* at 21. Since "issues adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation, are deemed waived," *McPherson v. Kelsey,* 125 F.3d 989, 995–96 (6th Cir.1997), Langley has waived any challenge to the district court's dismissal, based on futility, of all but Count I of the proposed third amended complaint. *See* J.A. 359, *Proposed Third Amended Complaint,* at ¶ 32 (alleging that Prudential, among others, wrongfully failed to release Langley's shares for sale, thereby committing a breach of contract).

■ The district court properly denied Langley leave to amend because it would have been futile for Langley to allege the claim that Prudential breached the terms of the Waiver Statement. Langley correctly notes that the Waiver Statement precluded him from selling his Purchase-Pro shares on March 20, 2000 without Prudential's prior written consent. The Waiver Statement, however, provides no limitation on Prudential's discretion in granting such consent. Langley counters that Prudential had no choice but to release his shares from the lock-up provision based on Prudential's knowledge of the oral agreement that members of the Lexington Group, including Langley, would not be subject to the lock-up provision in the Waiver Statement. But here Langley is merely attempting to have the prior oral agreement supersede the subsequent written Waiver Statement which plainly indicates that Langley's shares are subject to the lock-up provision. Kentucky's parol

evidence rule does not countenance such a result. *E.g., Cumnock–Reed Co. v. Lewis,* 278 Ky. 496, 128 S.W.2d 926, 929 (1939) ("To allow a party to say: 'It is true, I signed the note, but it was agreed I was not to pay,' is simply an attempt to vary the terms of the written contract by parol evidence of contemporaneous declarations.") (citations omitted). Since Langley has not challenged the district court's dismissal of his breach of contract claims based on the parol evidence rule, Langley cannot now argue that the district court erred in finding that amending his complaint to add a previously-dismissed breach of contract claim would have been futile. Accordingly, the district court did not err in denying Langley's motion for leave to file a third amended complaint.

**B. Summary judgment on Langley's four-count, second amended complaint**

The Court reviews a district court's grant of summary judgment *de novo. Parker v. Metro. Life Ins. Co.,* 121 F.3d 1006, 1009 (6th Cir.1997). A moving party is entitled to summary judgment as a matter of law when there are no genuine issues of material fact. *Id.;* Fed.R.Civ.P. 56(c). All evidence must be viewed in the light most favorable to the nonmoving party. *Ellison v. Garbarino,* 48 F.3d 192, 194 (6th Cir.1995). However, "[t]he moving party need not support its motion with evidence disproving the nonmoving party's claim, but need only show that there is an absence of evidence to support the nonmoving party's case." *Celotex Corp. v. Catrett,* 477 U.S. 317, 325, 106 S.Ct. 2548, 91 L.Ed.2d 265 (1986). "[W]here the nonmoving party faces a heightened burden of proof, such as clear and convincing evidence, he must show in opposition to the motion for summary judgment that he can produce evidence which, if believed, will meet the higher standard." *Moore, Owen, Thomas & Co. v. Coffey,* 992 F.2d 1439,

1444 (6th Cir.1993) (internal quotation marks and citations omitted).

**1. Rescission claim**

Langley has conceded on appeal that the district court properly dismissed his rescission claim. *Appellant's Br.* at 28. Therefore, the Court affirms the district court's grant of summary judgment for Defendants on this claim.

**2. Reformation and breach of reformed contract claims**

In order to reform a contract, Langley "assumes a heavy burden of proof under principles long established." *Carlson v. Ky. Ridge Coal Co.,* 125 F.Supp. 257, 259 (E.D.Ky.1954). As this Court stated over fifty years ago:

> It is the settled rule in Kentucky that one who signs a contract is presumed to know its contents, and that if he has an opportunity to read the contract which he signs he is bound by its provisions, unless he is misled as to the nature of the writing which he signs, or his signature has been obtained by fraud.

*Sears, Roebuck & Co. v. Lea,* 198 F.2d 1012, 1015 (6th Cir.1952) (citations omitted); *accord Stout v. J.D. Byrider,* 228 F.3d 709, 715 (6th Cir.2000) (Clay, J.). Accordingly, Langley must show that the Waiver Statement's inclusion of the lockup provision was "the result of mutual mistake of the parties or mistake of one party and fraud or inequitable conduct of the other." *Carlson,* 125 F.Supp. at 259. Moreover, Langley must make this showing by clear and convincing evidence. *Stagg v. Gibson,* 269 S.W.2d 180, 181 (Ky. 1954); *Collier's Guardian v. Collier,* 229 Ky. 746, 17 S.W.2d 1028, 1029 (Ky.1929); *Nat Harrison Assoc., Inc. v. Louisville Gas & Elec. Co.,* 512 F.2d 511, 513 (6th Cir.1975). *See also Carlson,* 125 F.Supp.

at 259 ("Many of the authorities on the subject in Kentucky and elsewhere require that the evidence must be so clear, decisive, explicit and satisfactory as to convince the court beyond all reasonable controversy.") (citations omitted).

■ The district court correctly concluded that Langley cannot meet the rigorous summary judgment standard for a reformation claim. First, it is undisputed that Langley signed the Waiver Statement and was afforded the opportunity to read it before signing it. Second, Langley is precluded from alleging that Prudential or anyone else acted fraudulently in procuring his signature, since the district court dismissed his fraud claim with prejudice and Langley does not challenge that ruling on appeal. Third, there is no evidence that Langley was misled when he was asked by PurchasePro to "redo" his Waiver Statement. In fact, to "redo" the Waiver Statement, Langley would have to have filled in the number of shares, signed the document *and* deleted paragraph 3. He failed to perform the latter act, but that omission did not stem from any deception on PurchasePro's part, let alone, Prudential's. Fourth, the record is devoid of any inequitable conduct on Prudential's part in connection with Langley's signature on the Waiver Statement. Langley was aware from the advice he had received from Lisle that he needed to delete paragraph 3 in order to avoid the lock-up restriction, and he certainly was aware of the tremendous amount of money that was at stake, having indicated on the form his desire to sell 50,000 shares. Thus, there is no clear and convincing evidence of mutual mistake or mistake that was procured through fraud or inequitable conduct. At best, Langley has shown a unilateral mistake on his part, which is not sufficient to reform a contract. *Berry v. Crisp*, 247 S.W.2d 384, 385 (Ky. 1952).

Langley's claim for breach of the reformed contract necessarily depended upon the viability of the reformation claim. Since the district court properly dismissed the reformation claim, the breach of contract claim also fails as a matter of law.

### 3. Stockbroker liability claim

The thrust of Langley's stockholder liability claim is that Prudential had the means to authorize the sale of Langley's shares under the Waiver Statement, but wrongfully failed to provide the authorization. Langley's assertion that Prudential's failure to authorize the sale was wrongful is premised on Prudential's alleged knowledge of the oral agreement that Langley was not subject to the lock-up provision. *See Appellant's Br.* at 30. In other words, Langley's legal theory of stockbroker liability is premised on the existence of an agreement that the district court correctly concluded was barred by the parol evidence rule, a conclusion that Langley has not challenged on appeal. Accordingly, the stockbroker liability claim fails as a matter of law.

Even ignoring the parol evidence problem, the plain language of the Waiver Statement did not require Prudential to authorize the sale of Langley's PurchasePro shares. Paragraph 3 of the Waiver Statement did not circumscribe Prudential's discretion. *See* 12Am.Jur.2d *Brokers* § 106 ("The existence and extent of the duties of an agent to his or her principal are determined by the terms of the agreement between the parties, interpreted in light of the circumstances under which it is made, except to the extent that fraud, duress, illegality, or the incapacity of one or both of the parties to the agreement modifies it or deprives it of effect.") As discussed above, Langley has presented no evidence of fraud or inequitable conduct on Prudential's part. Thus, the fact that Pru-

dential's refusal to provide authorization detrimentally impacted Langley is immaterial. *See* Restatement (Second) of Agency § 418 (1958) ("An agent is privileged to protect interests of his own which are superior to those of the principal, even though he does so at the expense of the principal's interests or in disobedience of his orders."). Therefore, summary judgment for Prudential was properly granted on this independent ground.

### III.

For all the foregoing reasons, the district court's orders of May 22, 2001 and June 13, 2002 are AFFIRMED.