*RECOMMENDED FOR FULL-TEXT PUBLICATION*
Pursuant to Sixth Circuit Rule 206
File Name: 09a0057p.06

# UNITED STATES COURT OF APPEALS

## FOR THE SIXTH CIRCUIT

_____

ARCH OF KENTUCKY, INC.,

*Petitioner,*

*v.*

No. 08-3311

DIRECTOR, OFFICE OF WORKERS'
COMPENSATION PROGRAMS, UNITED STATES;
UNITED STATES DEPARTMENT OF LABOR; and
FRED HATFIELD,

*Respondents.*

On Petition for Review of a Final Order
of the Benefits Review Board.
No. 06-0911.

Argued: January 21, 2009

Decided and Filed: February 17, 2009

Before: McKEAGUE and GRIFFIN, Circuit Judges; WEBER, Senior District Judge.[*]

_____

**COUNSEL**

**ARGUED:** Ronald E. Gilbertson, BELL, BOYD & LLOYD, Washington, D.C., for
Petitioner. Rita Ann Roppolo, UNITED STATES DEPARTMENT OF LABOR,
Washington, D.C., Sidney B. Douglass, Harlan, Kentucky, for Respondents.
**ON BRIEF:** Ronald E. Gilbertson, BELL, BOYD & LLOYD, Washington, D.C., for
Petitioner. Rita Ann Roppolo, UNITED STATES DEPARTMENT OF LABOR,
Washington, D.C., Sidney B. Douglass, Harlan, Kentucky, for Respondents.

---

[*]The Honorable Herman J. Weber, Senior United States District Judge for the Southern District
of Ohio, sitting by designation.

_____

**OPINION**

_____

McKEAGUE, Circuit Judge.   Fred Hatfield filed for benefits under the Black Lung Benefits Act, 30 U.S.C. §§ 901-944 ("Act").  His last employer, Arch of Kentucky, Inc. ("Arch"), raised several challenges to his claim.   Adjudicators for the U.S. Department of Labor's Office of Workers' Compensation Programs ("OWCP") granted his claim and the Department's Benefits Review Board ("BRB") affirmed on appeal.

Arch petitions this court to reverse.  For the reasons set forth below, we affirm.

**I**

**A.        1988 Claim**

Hatfield worked as a coal miner for twenty years, ending in 1987.  He filed a claim for benefits under the Act in 1988 and identified Arch as his last employer for which he worked at least one year ("1988 claim").  Arch, a St. Louis-based company, owns and operates coal mines in a number of states, including Kentucky.  Under the Act, Arch is the responsible operator and is liable for any benefits awarded.

In connection with the 1988 claim, twelve physicians submitted x-ray reports. Five of the reports indicated the presence of pneumoconiosis, while the remaining seven did not.  Giving greater weight to the more recent reports, both of which were positive, Administrative Law Judge ("ALJ") Kichuk found that Hatfield had pneumoconiosis. The ALJ also found that Hatfield was totally disabled.  As to whether the disability was due to the pneumoconiosis, the ALJ relied primarily upon the medical opinion of Dr. Bruce Broudy, whose qualifications were described as superior (including board certification in internal and pulmonary medicine) and who had most recently examined Hatfield.   In Dr. Broudy's opinion, Hatfield's disability arose from the claimant's chronic bronchitis caused by his long history of smoking.  Although one physician, Dr.

John Myers, Jr., had opined that Hatfield's disability resulted from his pneumoconiosis,[1] there was no indication that the physician was board certified and the physician's examination occurred eight months before Dr. Broudy's. Thus, based on Dr. Broudy's better qualifications and his more recent examination, the ALJ concluded that Hatfield was not totally disabled by pneumoconiosis and denied his 1988 claim. Hatfield did not appeal the ruling.

## B.     1993 Claim

### 1.     The Initial Finding

Hatfield filed a subsequent claim for benefits in June 1993 ("1993 claim"). A claims examiner with the OWCP notified Arch of the claim in July 1993. Arch's counsel responded in August 1993, indicating that the company was the responsible operator.

On December 1, 1993, a claims examiner informed Arch that the office had made a preliminary finding that Hatfield was entitled to benefits on the 1993 claim. The examiner further explained that if Arch wished to contest the finding, it must file a controversion (a merits challenge) within thirty days. If the company failed to respond within thirty days, the company would "be deemed to have accepted the initial finding, and this failure shall be considered a waiver of [the company's] right to contest this claim unless good cause is shown to excuse such failure (20 CFR 725.413)." JA 166. The company received the examiner's notice by certified mail on December 10, 1993.

Through its then-counsel, Arch submitted its controversion on February 22, 1994. The company did not contest the timeliness of Hatfield's 1993 claim, but did contest whether (a) he had pneumoconiosis; (b) he was totally disabled; (c) any disability was caused by the condition; and (d) the miner's death was due to the condition (Note: Hatfield was not deceased).

---

[1]Dr. Myers diagnosed Hatfield with "Coal workers' pneumoconiosis" which "would meet the criteria for disability by Federal Black Lung Regulation 718, Appendix B." JA 305. He further noted that Hatfield's "silicosis results from his entire exposure history and is permanent." JA 307.

The OWCP Director informed the company that the office had not received a timely response to its earlier notice of initial finding. The Director treated the lack of a timely response as a default, explaining, "Arch of Kentucky, Inc. is deemed to have accepted the Initial Finding of the District Director and shall not, except as provided in 725.463, be permitted to raise issues or present evidence with respect to issues inconsistent with the Initial Finding in any further proceeding conducted with respect to the claim." JA 173.

Arch's counsel replied on March 17, 1994. He acknowledged that the company had not filed its controversion within the allotted time period. He sought to establish good cause for the delay, however, explaining in full,

> [D]ue [to] some person[n]el changeovers in the last two months or so in this office, a very few things got miscal[e]ndared or not cal[e]ndared at all. This was one. The person[n]el problem was resolved; nevertheless, a problem in this case remains. There is no doubt that it is my responsibility that the controversion was late, but in fairness, a clerical error under these circumstances should not be interposed to prevent Arch from defending this claim.

JA 180. The Director denied the request to accept the untimely controversion, but informed the company that it could appeal the adverse good-cause finding, which the company did.

### 2.    Subsequent Appeals and Remands

Hatfield's 1993 claim then went through numerous rounds of appeals and remands spanning over a decade. Only those rulings with direct bearing on the instant petition for review are summarized below.

ALJ Rippey awarded benefits to Hatfield based on the Director's initial award, finding that Arch's controversion was untimely. The BRB affirmed.

Arch requested a modification of the award pursuant to 33 U.S.C. § 922, as incorporated at 30 U.S.C. § 932(a) and 20 C.F.R. § 725.310. Modification permits the fact-finder to reconsider prior decisions, whether based on previously developed or

newly developed evidence. Arch argued that the award was based on erroneous findings of fact.

The BRB determined that the modification procedure did not provide Arch with an alternate avenue for attacking the merits of the award. It explained that if a party fails to contest timely an initial finding, the party cannot raise an issue or present evidence inconsistent with that finding in a subsequent proceeding unless it first demonstrated good cause for the untimely response. The BRB remanded the matter for further consideration of the good-cause issue.

On remand, ALJ Wood found that Arch had failed to show good cause for its tardy controversion. The ALJ acknowledged that Hatfield had likely not suffered any prejudice by the delay. She noted that Arch's counsel's original explanation was, in essence, that the notice of initial award got "lost-in-the-shuffle." The ALJ, however, placed considerable emphasis on the failure by Arch's counsel to provide any additional detail of that original explanation or any evidence to support it. The company also argued that the initial award had not been sent by registered or certified mail, but the ALJ found that assertion to be plainly rebutted by the copy of the certified-mail receipt in the record.

On appeal, the BRB affirmed. Arch then raised a new argument before the BRB: whether Hatfield's 1993 claim was itself untimely under the three-year statute of limitations applicable to any claim filed after a miner is given a positive diagnosis of total disability due to pneumoconiosis. The Director argued before the BRB that Arch could not raise the timeliness of Hatfield's 1993 claim at this late stage. The BRB reasoned, however, that under its then-interpretation of the statute of limitations in 1993-1994, the limitations period did not apply to subsequent claims, only to initial claims. There being no question that Hatfield timely filed his initial claim, it would have been futile for Arch to have raised the timeliness issue in 1994. Since then, however, several federal courts (including this one) have applied the statute of limitations to subsequent claims. *See, e.g.*, *Tenn. Consol. Coal Co. v. Kirk*, 264 F.3d 602, 607 (6th Cir. 2001). The BRB remanded the statute-of-limitations issue for further proceedings.

On remand, ALJ Phalen found that the 1993 claim was timely. The ALJ held that any positive diagnosis filed in support of the 1988 claim was to be deemed a misdiagnosis because that claim was ultimately denied. Alternatively, the ALJ found that a positive diagnosis had not been communicated to Hatfield prior to his filing the 1993 claim. On appeal, the BRB rejected the former holding of ALJ Phalen, but adopted the latter. It affirmed the award of benefits to Hatfield.

Arch petitioned this court for review of the BRB's rulings.

## II

### A.    Standard of Review

On petition for review of a decision of the BRB, our "task 'is limited to correcting errors of law and ensuring that the [BRB] adhered to the substantial evidence standard in its review of the ALJ's factual findings.'" *Crockett Colleries, Inc. v. Barrett*, 478 F.3d 350, 352 (6th Cir. 2007) (quoting *Creek Coal Co., Inc. v. Bates*, 134 F.3d 734, 737 (6th Cir. 1997)). "Substantial evidence is defined as relevant evidence that a reasonable mind might accept as adequate to support a conclusion." *Martin v. Ligon Preparation Co.*, 400 F.3d 302, 305 (6th Cir. 2005) (citing *Peabody Coal Co. v. Groves*, 277 F.3d 829, 833 (6th Cir. 2002)). We review the BRB's legal conclusions de novo. *Crockett Colleries*, 478 F.3d at 352.

### B.    Arch's Default

To begin, it is undisputed that Arch's prior counsel failed to submit a timely controversion to Hatfield's 1993 claim. The regulation in force at the time, 20 C.F.R. § 725.413(b) (1993), required that any failure to contest an initial finding of entitlement to benefits within thirty days be deemed an acceptance of that finding without further recourse to raise issues or present evidence inconsistent with that finding, absent a showing of good cause. Arch submitted its controversion eighty-one days after the initial finding and did not attempt to show good cause until almost a month after submitting its controversion.

On petition before this court, Arch first takes a wide swing at the administrative-default rule. The company maintains that the rule violates both federal due process and the Administrative Procedure Act ("APA"). In essence, Arch argues that there is nothing fair about precluding it from obtaining a full hearing on the merits of the 1993 claim. This argument suffers from a couple of defects. The company's due process/APA argument consists of five sentences. It cites only one case in support, and does so for the unremarkable proposition that procedural due process is applicable to the adjudicative administrative proceeding. *Richardson v. Perales*, 402 U.S. 389, 401 (1971). An argument calling into question the very constitutionality of an agency's regulation requires more development than what Arch provides here. *See Indeck Energy Servs. v. Consumers Energy*, 250 F.3d 972, 979 (6th Cir. 2000) (holding that issues only "adverted to in a perfunctory manner, unaccompanied by some effort at developed argumentation" are waived).

More fundamentally, the administrative-default rule, akin to the default-judgment rule in federal court, does not itself violate federal due process or the APA. The basic elements of procedural due process are notice and opportunity to be heard. *See Mullane v. Cent. Hanover Bank & Trust Co.*, 339 U.S. 306, 313 (1950). Congress incorporated these principles into the APA. *See* 5 U.S.C. § 554. The regulation at issue here provided both notice of the initial finding and the opportunity to be heard, as well as an opportunity to file an untimely controversion if the employer could establish good cause for the delay. *See* 20 C.F.R. § 725.413(b) (1993). "[D]ue process generally does not entitle parties to an evidentiary hearing where the [federal agency] has properly determined that a default summary judgment is appropriate due to a party's failure to file a timely response." *Father & Sons Lumber & Bldg. Supplies, Inc. v. NLRB*, 931 F.2d 1093, 1096 (6th Cir. 1991) (citing *NLRB v. Aaron Convalescent Home*, 479 F.2d 736, 738-39 (6th Cir. 1973)). Arch's broad attack on the administrative-default rule fails.

As to the question of good cause, the ALJ started off by acknowledging that Hatfield had not been prejudiced by the delay. However, while explaining that personnel problems could justify a late filing under certain circumstances, the ALJ

correctly noted that counsel failed to offer any details of what exactly happened to cause the attorney to miss the deadline. To this day, Arch has offered little to support its good-cause argument—there are no affidavits or other evidence in the record that would provide some detail to the attorney's vague assertion of a personnel problem. The lack of record evidence distinguishes this case from the decision relied upon by Arch, *George Harms Construction Co., Inc. v. Chao*, 371 F.3d 156, 165 (3d Cir. 2004), where the court held that a party had established excusable neglect through, among other things, testimony about the party's mail-handling procedures. Here, without any evidence explaining why or how the purported personnel problems caused the missed deadline or any evidence of counsel's diligence once the problem was identified, it cannot be said that the ALJ abused her discretion in denying Arch's request to file an untimely controversion.

Arch continues to contend, as it did during the administrative proceedings, that the Director did not properly serve the company with the December 1, 1993, initial findings. This argument is contradicted by the record evidence, which includes a copy of the return receipt of certified mail. Arch has not explained how this receipt is erroneous or offered any evidence contradicting the clear inference to be drawn from the receipt.

Arch next argues that because the examiner did not set forth an explicit finding of a material change in condition from the earlier 1988 claim, the initial finding of liability on the subsequent 1993 claim is legally insufficient. Under 20 C.F.R. § 725.309, a subsequent claim for benefits under the Act must show "a material change in conditions since the prior claim's denial." *Grundy Mining Co. v. Flynn*, 353 F.3d 467, 470 (6th Cir. 2003) (internal quotation marks omitted). Because there was no material-change finding to controvert, its tardiness should have no effect on whether it can challenge the award based on the lack of that finding, according to Arch.

The initial finding did not include a section detailing the examiner's analysis of each element for liability. Instead, the correspondence simply explained, "We have made an initial finding based upon the submitted evidence that the claimant is entitled

to benefits." Yet, the initial finding did clearly put Arch on notice that if the company failed to respond within thirty days, then the company's silence would be deemed an acceptance of the initial finding—Hatfield's entitlement to benefits beginning in 1993—and would waive its right to contest this *claim.* Importantly, the waiver was not limited to the right to contest specific findings, but rather to contest the entire claim. Thus, whether the examiner made detailed findings on all of the elements of a subsequent claim are beside the point when considering what exactly Arch gave up by failing to controvert within the specified time period.

Finally, Arch maintains that its request for modification should have permitted it to attack the merits of Hatfield's 1993 claim regardless of the timeliness of its controversion. This argument is ill-founded, as there would be little use in having a default provision in the first place if everything could be reopened by a subsequent request for modification. Section 725.413(b)(3) (1993) makes clear that the default provision does not just fade away upon a modification request—a party is prohibited from contesting the initial award "in *any* further proceedings conducted with respect to *the claim.*" (emphasis added). A request to modify the award of a claim is clearly a "further proceeding conducted with respect" to that claim and is, therefore, precluded under the default rule.

Accordingly, we reject both Arch's challenge to the BRB ruling that the company defaulted the 1993 claim and its argument that a request for modification required the adjudicator to address the merits of its controversion, irrespective of the default.

**C.     The Timeliness of Hatfield's Subsequent 1993 Claim**

Next, Arch challenges the BRB's ruling that Hatfield timely submitted his 1993 claim.[2] There is a rebuttable presumption that any claim made for black-lung benefits

---

[2]Although the BRB found that Arch had defaulted on the merits of the 1993 claim, the board did not similarly find that the company had defaulted or otherwise waived a challenge to the claim based on the three-year statute of limitations applicable to miners. The BRB reasoned that it would have been futile for Arch to have raised the challenge at the outset given the then-existing rule that the statute of limitations applied only to initial claims, not to subsequent claims. Of course, Arch failed to raise *any* timely challenge to the 1993 claim and in its tardy controversion it specifically declined to challenge the limitations issue. *See* JA 171. Yet, none of the respondents have challenged here the BRB's decision to permit Arch to make the statute of limitations argument several years after Hatfield filed his subsequent

is timely. 20 C.F.R. § 725.308(c). Title 30 U.S.C. § 932(f)(1) provides, "Any claim for benefits by a miner under this section shall be filed within three years after . . . a medical determination of total disability due to pneumoconiosis . . . ." The implementing regulations similarly provide, "A claim for benefits filed under this part by, or on behalf of, a miner shall be filed within three years after a medical determination of total disability due to pneumoconiosis which has been communicated to the miner or a person responsible for the care of the miner . . . ." 20 C.F.R. § 725.308(a). The employer has the burden to show that the miner's claim was outside the statute of limitations period. *Id.* § 725.103. The limitations period applies to both initial and subsequent claims. *Kirk*, 264 F.3d at 607 (applying statute of limitations to subsequent claim of a miner).

Dr. Myers diagnosed Hatfield with pneumoconiosis from mining in January 1988. If Dr. Myers's positive diagnosis was sufficient to start the limitations period and if that period did not get reset by the denial of Hatfield's 1988 claim, then the subsequent 1993 claim was untimely.

The parties disagree on when the statute of limitations generally begins to run. There are at least two possible starting points. One point would be when a diagnosis is first made by a medical professional and that diagnosis is communicated to the claimant or his caregiver, regardless of whether the diagnosis turns out to be a valid one or a misdiagnosis. Another point would be when a diagnosis is first made by a medical professional and it is effectively communicated, but *only if* that diagnosis turns out to be a valid one. If, for example, an ALJ found that a positive diagnosis by one physician was mistaken or otherwise outweighed by one or more negative diagnoses of other physicians and on that basis denied the claim, the positive diagnosis would be considered a misdiagnosis and would not start the clock for the limitations period.

The BRB rejected the latter possible starting point in favor of the former. In doing so, it relied upon this court's decision in *Kirk* and found that the denial of the 1988 claim would not by itself restart the limitations period. The BRB concluded that the

---

claim, so we will not consider whether the BRB erred by permitting Arch to pursue the argument.

claim was timely, though, because it found substantial evidence supporting the ALJ's factual finding that Hatfield had not received communication of any positive diagnosis prior to 1993.

We have serious doubts about the soundness of the factual finding by the ALJ. Briefly, Hatfield had submitted a state claim for disability benefits around the same time he first sought federal benefits in 1988. In that state form, Hatfield asserted that he suffered from "occupational pneumoconiosis/silicosis" and was totally and permanently disabled. He signed the form, swearing to the truth of the statements made, and had it notarized. Importantly, Dr. Myers's positive medical diagnosis was included as an attachment to the form and was referenced therein. *See supra* n.1. It is a long-standing rule of law that one is presumed to have read what he signs. *See, e.g.*, *Maier v. Fid. Mut. Life Ass'n*, 78 F. 566, 570 (6th Cir. 1897); *see also Allied Steel & Conveyors, Inc. v. Ford Motor Co.*, 277 F.2d 907, 913-14 (6th Cir. 1960); *Langley v. Credit Suisse First Boston Corp.*, 89 F. App'x 938, 946 (6th Cir. 2004) (unpublished). This presumption would normally apply not only to the contents of the signed form but also to its attachments, especially when those attachments are specifically referenced in the form.

We need not decide, however, whether the ALJ had substantial evidence to support its factual finding on communication of the positive diagnosis. We can, instead, affirm the ultimate ruling of the BRB that the 1993 claim was timely based on a ground other than the one actually relied upon by the board. *See Crockett Colleries*, 478 F.3d at 358-59 (Rogers, J., concurring) (explaining that the *Chenery* doctrine does not preclude a federal court from affirming a BRB ruling on a different ground). We turn to the legal question of when the statute of limitations begins.

In *Sharondale Corp. v. Ross*, 42 F.3d 993, 996 (6th Cir. 1994), this court held that the limitations period resets if a miner returns to mining work after the denial of his initial claim. The court stated that the three-year period begins again on each determination of total disability due to pneumoconiosis and cannot run until the miner finally retires. *Id.* This made particular sense to the court for several reasons:

> The progressive nature of the disease dictates this result; a claimant must be free to reapply for benefits if his first filing was premature. Furthermore, the Act recognizes that sequential claims may be filed; and for the Act to recognize serial applications on the one hand, while limiting to three years the time in which all applications must be filed, on the other, makes no sense.

*Id.* Because the miner had returned to mining work after the denial of his first claim, the court was not faced with the present situation where a miner did not return to such work between claims.

This court had occasion again to consider the limitations period in *Kirk*. There, the court stated that absent an intervening return to mine work, the limitations period begins to run "*the first time* that a miner is told by a physician that he is totally disabled by pneumoconiosis" and "is not stopped by the resolution of the miner's claim or claims." *Kirk*, 264 F.3d at 608 (emphasis in original). In that panel's opinion, "Medically supported claims, even if ultimately deemed 'premature' because the weight of the evidence does not support the elements of the miner's claim, are effective to begin the statutory period." *Id.* The court noted one benefit of this approach: "This distinction deters finding 'compliant physicians' willing to give the miner an overly-favorable diagnosis that cannot be supported by the weight of the medical evidence." *Id.* n.5. It further highlighted, however, one drawback: "[T]he chief danger with this rule, even given the constraint of communication to the miner, could be that unscrupulous employers could conveniently avoid all liability by purposely making premature determinations." *Id.* (internal quotation marks and brackets omitted).

In rejecting the reasoning of *Kirk*, subsequent decisions by this court and at least one other sister circuit have recognized or suggested that *Kirk*'s discussion of when the limitations period begins was dicta. *See Consolidation Coal Co. v. Williams*, 453 F.3d 609, 616-17 n.2 (4th Cir. 2006) (describing the discussion in *Kirk* as dicta); *Ken Lick Coal Co. v. Lacy*, No. 06-4512, order at 3-4 (6th Cir. Nov. 2, 2007) (unpublished) (describing the discussion in *Kirk* as dicta); *Peabody Coal Co. v. Director, OWCP*, 48 F. App'x 140, 144 (6th Cir. 2002) (unpublished) ("*Duke*") (suggesting without deciding that the discussion in *Kirk* was dicta); *cf. Wyo. Fuel Co. v. Director, OWCP*, 90 F.3d

1502, 1507 (10th Cir. 1996) (holding in a decision prior to *Kirk* that "a final finding by an Office of Workers' Compensation Program adjudicator that the claimant is not totally disabled due to pneumoconiosis repudiates any earlier medical determination to the contrary and renders prior medical advice to the contrary ineffective to trigger the running of the statute of limitations"). The *Kirk* court found that there was, in fact, nothing in the record to establish that a physician had positively diagnosed the claimant more than three years prior to the date he filed his claim. 264 F.3d at 607. Thus, the court's subsequent discussion of what would happen to the clock if there had been an earlier positive diagnosis was not necessary to the outcome of the case and is properly considered dicta. *United States v. Swanson*, 341 F.3d 524, 530 (6th Cir. 2003).

Both 30 U.S.C. § 932(f) and 20 C.F.R. § 725.308(a) provide that the limitations period begins after "a medical determination of total disability due to pneumoconiosis." As the *Duke* panel recognized, the term "medical determination" is not defined in the statute or regulation. 48 F. App'x at 145. This court has previously concluded that the term does not include undiagnosed cases of pneumoconiosis, *Sharondale*, 42 F.3d at 996 ("[A] claimant must be free to reapply for benefits if his first filing was premature."), or self-diagnosed cases, *Kirk*, 264 F.3d at 607 ("[T]he statute makes what Kirk believes about his condition irrelevant to the initiation of the limitations clock."). What precisely is meant by a "medical" diagnosis is subject to some refinement. To look at an extreme example, presumably a medical diagnosis does not include one by a dentist, an optometrist, a pediatrician, a registered nurse, or a pharmacist, even though all of these are medical professionals. Any diagnosis by one of these medical professionals would be deemed a misdiagnosis, a nullity, because of their lack of training in internal and pulmonary medicine. Thus, there seems little question that at least some otherwise positive diagnoses should be ignored for purposes of starting the limitations clock.

As a remedial statute intended to benefit injured miners, the Act has always been interpreted with any ambiguity weighed in favor of miners. *Grundy Mining*, 353 F.3d at 476; *Sharondale*, 42 F.3d at 996. This court has long recognized that Congress

intended to include as many miners under the Act as possible. *Grundy Mining*, 353 F.3d at 476; *Sharondale*, 42 F.3d at 996.

The statute of limitations "exists to promote the quick filing of worthy claims." *Duke*, 48 F. App'x at 147. It does not exist as a trap for the unwary or unsophisticated miner. Given the recognized "latent and progressive" nature of the disease, 20 C.F.R. § 718.201(c), a restrictive interpretation of "medical diagnosis" is unwarranted because it would, in effect, penalize a miner who sought a consultation too soon and received a determination from a physician who decided to err on the side of aggressive diagnosis. "Holding the miner responsible for a *genuine* misdiagnosis unjustly holds him responsible for the principled medical judgment of a doctor, presumably far more skilled and educated than the miner." *Duke*, 48 F. App'x at 146 (emphasis in original).

Relatedly, a restrictive interpretation would create a disincentive for a miner to seek an early diagnosis and treatment; the miner could become "overly cautious about being screened for the disease." *Id.* at 147. Indeed, a rational miner might wait to consult a physician until the disease had progressed to the point that the diagnosis would be obvious to *any* trained physician so as to ensure his claim will be granted. "If a miner knows that a misdiagnosis will ultimately mean that he can never again seek benefits should he eventually contract this progressive disease, he will be less likely to be proactive in seeking medical advice during the early stages." *Id.*

A restrictive interpretation would also be in tension with the Act's provision permitting successive claims. *See Sharondale*, 42 F.3d at 996. Claims for benefits often take longer than three years to adjudicate fully (as evidenced by the present action); thus, if any positive diagnosis starts the clock, then in a substantial number of cases, the miner will get only one chance to file for benefits. In this circumstance, if the ALJ was to deny the claim because the positive diagnosis was in error or otherwise outweighed by the other evidence, then the miner would be without recourse to file another claim based on new evidence that his condition had progressed.

It is true, as the court explained in *Kirk*, that resetting the clock based on the denial of a claim could open the door for a miner to shop for a compliant doctor, willing

to give a diagnosis of pneumoconiosis where the evidence does not support it. 264 F.3d at 608 n.5. However, as evidenced by this and other black-lung cases, it is clear that the administrative adjudicators do not rubber-stamp these claims. Thus, this concern, while not trivial, only becomes a systemic problem if the adjudicators also become complicit. *See Duke*, 48 F. App'x at 146. "Besides, if [the court were to] hold to the contrary, an unscrupulous employer could avoid future liability by purposely making a premature determination—a far more unchecked concern." *Id.* (citing *Kirk*, 264 F.3d at 608 n.5).

There is another concern that could exist when a limitations period is subject to reset—a never-ending succession of claims by the same claimant. In the context of black-lung benefits, however, this concern has been addressed. First, Congress made the policy choice to permit a miner to file successive claims, thereby deciding to err on the side of too many claims than on the side of too few. Second, to offset the incentive of filing until a compliant adjudicator is found, a miner cannot refile the same claim supported with the same evidence over and over, but must show a material change in condition since the previous denial. This additional evidentiary requirement for successive claims counters the concern that resetting the period will open the floodgates for benefits claims.[3]

Finally, not only does resetting the period make sense from the perspective of the Act's purpose and language, it has the additional salient feature of respecting the finality of decisions of the administrative adjudicators. An earlier, unappealed decision denying a claim for lack of medical evidence must be accepted by the federal courts as "final and correct." *Consolidation Coal*, 453 F.3d at 616. But, if a positive medical diagnosis, though found wanting by the adjudicator, was deemed to be sufficient to start the clock, the correctness of the adjudicator's denial would be called into question, at least implicitly. A legal determination that a claim should be denied on the merits "necessarily refute[s]" the countervailing evidence submitted in support of the claim. *Id.* The regulations reinforce this principle by requiring that a subsequent claim be

---

[3]Because Arch defaulted the claim, though, the company lost its opportunity to test the 1993 claim for a material change in conditions, as explained *supra*.

supported by a material change in conditions—i.e., a claimant cannot simply ask for a do-over with the same medical evidence from the first denied claim.  Thus, principles of finality and comity further counsel in favor of resetting the clock after the denial of a claim.

Accordingly, we apply *Sharondale*'s rule resetting the limitations period to the situation where a miner has filed a claim and included with it what is purported to be a positive diagnosis, but the diagnosis is outweighed by countervailing evidence and denied on that basis.  In this situation, the misdiagnosis is not legally distinguishable from a nondiagnosis or self-diagnosis.

The ALJ denied Hatfield's 1988 claim because of insufficient medical evidence that the miner's disease was caused by his mining work.  Although Dr. Myers did draw that causal connection, the ALJ found that Dr. Myers's opinion was outweighed by the negative report of a more-experienced physician who had examined Hatfield more recently.  The ALJ's decision served not only to deny that claim for benefits, but also to reset the clock on any subsequent claim made by Hatfield.  We affirm the BRB's finding that Hatfield timely submitted his 1993 claim, although on a different ground than the one relied upon by the BRB.

### III

For the reasons set forth above, we DENY Arch's petition for review and AFFIRM benefits in favor of Hatfield.